IN THE

# ARIZONA COURT OF APPEALS

DIVISION TWO

―――――――――――――――

THE STATE OF ARIZONA,
*Appellee*,

*v.*

TIMOTHY ANDREW PARKINSON,
*Appellant*.

No. 2 CA-CR 2023-0046
Filed July 15, 2024

―――――――――――――――

Appeal from the Superior Court in Pima County
No. CR20210757001
The Honorable Javier Chon-Lopez, Judge

**VACATED AND REMANDED**

―――――――――――――――

COUNSEL

Kristin K. Mayes, Arizona Attorney General
Alice M. Jones, Deputy Solicitor General/Section Chief of Criminal Appeals
By Michael T. O'Toole, Assistant Attorney General, Phoenix
*Counsel for Appellee*

Megan Page, Pima County Public Defender
By Erin K. Sutherland, Assistant Public Defender, Tucson
*Counsel for Appellant*

**OPINION**

Judge Eckerstrom authored the opinion of the Court, in which Judge Kelly concurred and Presiding Judge Brearcliffe dissented.

E C K E R S T R O M, Judge:

**¶1**        Timothy Parkinson appeals from his convictions and terms of probation for aggravated assault and domestic violence assault.  He argues the trial court infringed on his constitutional right to present a complete defense.  Because we agree with Parkinson on this issue, we vacate his convictions and remand for a new trial.  We reject Parkinson's remaining claims on appeal.[1]

### Factual and Procedural Background

**¶2**        We view the facts in the light most favorable to sustaining the jury's verdicts and resolve all reasonable inferences against Parkinson.  *See State v. Fierro*, 254 Ariz. 35, ¶ 2 (2022).  Parkinson and D.G. were involved in a romantic relationship for around two years.  In March 2021, D.G. called 9-1-1 and reported that her boyfriend had attacked her inside his apartment.  D.G. declined medical treatment while on the 9-1-1 call.  She also declined a strangulation forensic examination.  D.G. told the police that Parkinson had strangled her and had "hit her at least eight times with a belt."

**¶3**        At trial, D.G. testified that Parkinson had been upset with her for spending time with a friend the evening before the incident, prompting him to pack up some of her belongings.  The next morning, D.G. asked Parkinson for her car keys so she could go to work.  In response, Parkinson "snapped" and attacked her.  D.G. testified that he pinned her down on a piece of furniture and choked her.  He later also choked her on the ground with two hands until she "started seeing . . . gray" and she "couldn't breathe."  She said this occurred five or six times, for about a minute each time.  Parkinson then struck D.G. with a belt until she grabbed it from him.  D.G. testified that she remembered Parkinson kicking her before ultimately

_____

[1]Because it is unlikely to recur on remand, we do not address Parkinson's argument that the trial court erred in refusing to strike certain jurors for cause.

leaving the apartment because she called 9-1-1. Afterward, D.G. waited outside the apartment for police to arrive.

¶4 A responding police officer reported observing on D.G.'s body "injuries that were consistent with strikes with a belt, being grabbed by someone, and strangulation around the neck." These included "[r]edness around her throat area, just under her chin," bruising around both sides of the neck and behind the ear, and petechiae, or "blood vessels that have burst," in her ear and in one eye. The officer also observed welts on D.G.'s stomach, as well as redness and bruising on her extremities.

¶5 The state charged Parkinson with one count of aggravated assault and one count of domestic violence assault. At the conclusion of a four-day trial, a jury found him guilty as charged. After a hearing, the trial court denied Parkinson's motion for new trial. It suspended the imposition of sentence and placed Parkinson on concurrent three-year terms of supervised probation. This appeal followed. We have jurisdiction pursuant to A.R.S. §§ 12-120.21(A)(1), 13-4031, and 13-4033(A).

## Discussion

### I.  Preclusion of Defense Evidence

¶6 On August 1, 2022, Parkinson notified the state of his intent to call M.B. as a witness regarding D.G.'s credibility. On September 16—the last business day before trial—the state asked the trial court to preclude certain testimony from M.B., including "any reference to some prior incident" of violence between D.G. and Parkinson. In response, Parkinson emphasized that the evidence—which was broader than had been indicated by the state and included a number of police reports—would be presented not to show D.G.'s violent character, but rather to demonstrate that, in the months before the March 2021 incident, D.G. had made multiple "false allegations" to police in pursuit of her desire "to get [Parkinson] into custody."

¶7 On the first morning of trial, the state filed a motion *in limine* contending that any testimony from M.B. elicited to show D.G.'s "violent character" or to raise doubts regarding D.G.'s honesty would be inadmissible under Rules 404(a) and 608, Ariz. R. Evid. The state further urged the trial court to preclude as irrelevant any evidence of "conflicting no-contact orders" D.G. and Parkinson had obtained against each other, and "[w]hether there was an attempt-to-locate out, for law enforcement to speak with" D.G. In response, Parkinson reiterated that the evidence was

not being offered to show D.G.'s violent character, but instead to show "her motive, her bias, her prejudice in testifying." In particular, he argued it would show that, in January and February 2021, D.G. had been "attempting to fabricate charges against [Parkinson] to punish him because she believed he was cheating." He advised that D.G. had been arrested after the February 2021 incident and was ordered not to contact Parkinson, but that she had violated the order, "sneaking into his apartment" and stealing things. This led Parkinson to contact police for enforcement of the no-contact order, as well as the issuance of an attempt-to-locate that was in place on the date of the incident in March 2021.

¶8 Citing Rule 608, the trial court granted the state's motion to preclude evidence of the prior acts of violence between D.G. and Parkinson. It ruled that M.B. could testify regarding his opinion of D.G.'s truthfulness, not the bases for his opinion or specific instances of D.G.'s conduct. The court further concluded Parkinson had not shown by clear and convincing evidence that the other acts between the parties had "occurred as stated." It thus precluded any testimony regarding "any no-contact orders that were in place" or any attempt-to-locate. Finally, it found that even if evidence of the prior acts was relevant, it should be precluded under Rule 403, Ariz. R. Evid., because it posed "a danger of unfair prejudice, confusing the issues."

¶9 Later that day, Parkinson made an offer of proof, including several police reports, the no-contact order against D.G., and evidence of his February efforts to get police to enforce that order and keep D.G. out of his apartment. One police report in particular, generated after the February 2021 incident, shows that D.G. initially called 9-1-1 complaining that Parkinson had "dislocated her shoulder." A responding officer observed no sign of injury, noting that D.G. appeared to have "full range of motion" and that there was no observable "injury to [D.G.'s] person." When officers instead arrested D.G. for this incident, she "advised it was not fair she was getting arrested" and "asked if she could snitch on [M.B.] and Parkinson" for unrelated criminal behavior. Parkinson stated this evidence would corroborate testimony from himself and from M.B. that D.G. had lied to police on multiple occasions to "fabricate charges against him." He reiterated that the evidence was offered to show "motive, bias, and prejudice" on the part of D.G. during her testimony at trial. The trial court accepted Parkinson's offer of proof but affirmed its prior ruling. Although the testimony would have been corroborated by police reports and the no-contact order, the court reiterated its conclusion that Parkinson had not shown by clear and convincing evidence that the prior acts had occurred. It further repeated that the evidence should be excluded under Rule 403

given "the dangers of unfair prejudice and confusion of the issues and having mini trials."

¶10 The next day, the trial court denied Parkinson's motion to reconsider this ruling.[2] Consequently, although M.B. testified at trial, his testimony was limited to saying only "what he kn[ew] about [D.G.'s] truthfulness," specifically that, during the course of their friendship, he did not observe her to be a credible or truthful person. Parkinson was not permitted to inquire into "observed instances of jealousy" or "instances of [D.G.] making accusations" against Parkinson that he argued were relevant to motive.

¶11 Parkinson then testified. He averred that by the morning of the incident, he had ended the romantic relationship and had asked D.G. to move out of his apartment, but she had refused. He also told the jury that D.G. had developed jealousy during the relationship and that, although she was honest "for the most part," at times she would "lie by omission or misstate the truth" to "elicit sympathy" or "if she was covering up for something that she felt embarrassed or guilty about." However, in deference to the trial court's evidentiary ruling, Parkinson's counsel did not attempt to question him about the January or February 2021 incidents or attempt to introduce the police reports, the no-contact order, or the attempt-to-locate to impeach D.G.'s version of the events during its questioning of any witnesses. Parkinson was also specifically prevented from testifying about D.G.'s alleged history of self-harm.

¶12 On appeal, Parkinson argues the trial court's evidentiary rulings infringed on his constitutional right to present a complete defense, including the right to confront adverse witnesses. Specifically, he argues the court erred by precluding evidence of D.G.'s other acts, which he would have presented in the form of testimony and police reports to show D.G. was not credible and had a motive or plan to fabricate the attack.

¶13 We review a trial court's determination of the relevance and admissibility of evidence for abuse of discretion. *State v. Rose*, 231 Ariz. 500, ¶ 62 (2013). We review constitutional questions de novo, including whether a defendant's right to confront a witness has been infringed. *See State v. Dunbar*, 249 Ariz. 37, ¶ 25 (App. 2020) ("[T]o the extent a defendant

---

[2]The trial court later denied Parkinson's motion for new trial, which was premised in part on his claim that these evidentiary rulings had deprived him of his constitutional right to cross-examination.

'sets forth a constitutional claim in which he asserts that the information is necessary to his defense,' we will conduct a de novo review." (quoting *State v. Connor*, 215 Ariz. 553, ¶ 6 (App. 2007))).

**¶14** "Few rights are more fundamental than that of an accused to present witnesses in his own defense." *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973). This due process "right to present the defendant's version of the facts . . . to the jury so it may decide where the truth lies" is protected by the Sixth and Fourteenth Amendments of the United States Constitution. *Washington v. Texas*, 388 U.S. 14, 17-19 (1967); *see also State v. Harrod*, 218 Ariz. 268, ¶ 20 (2008).

**¶15** Our federal and state constitutions also protect a defendant's due process right to cross-examine witnesses. *See* U.S. Const. amends. VI, XIV, § 1; Ariz. Const. art. II, §§ 4, 24. This guarantee includes the opportunity "to prove a witness's motive or bias." *State v. Almaguer*, 232 Ariz. 190, ¶ 22 (App. 2013); *see also Davis v. Alaska*, 415 U.S. 308, 316-17 (1974) ("[E]xposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination."). Bias, in this context, includes "all forms of partiality that may be proven by extrinsic evidence," including interest and motive. *State v. Dunlap*, 187 Ariz. 441, 456 (App. 1996) (quoting *In re C.B.N.*, 499 A.2d 1215, 1219 (D.C. 1985)). This "right of cross-examination is more than a desirable rule of trial procedure. It is implicit in the constitutional right of confrontation, and helps assure the 'accuracy of the truth-determining process.'" *Chambers*, 410 U.S. at 295 (quoting *Dutton v. Evans*, 400 U.S. 74, 89 (1970)); *see also State ex rel. Montgomery v. Duncan*, 228 Ariz. 514, ¶ 8 (App. 2011) ("purpose of cross-examination is to aid in the truth-finding process"). We have held that "[c]ross-examination for this purpose is especially important" where, as here, "the credibility of a key government witness is the central factor to be weighed by the trier of fact." *Dunlap*, 187 Ariz. at 456.

**¶16** In short, although trial courts "retain wide latitude to impose reasonable limits on cross-examination based on, among other things, confusion of the issues," *Almaguer*, 232 Ariz. 190, ¶ 22, any "denial or significant diminution" of a defendant's right to confront and cross-examine witnesses "calls into question the ultimate 'integrity of the fact-finding process,'" *Chambers*, 410 U.S. at 295 (quoting *Berger v. California*, 393 U.S. 314, 315 (1969)). The test for whether a trial court's limitations are reasonable is "whether the defendant has been denied the opportunity of presenting to the trier of fact information which bears either on the issues

in the case or on the credibility of the witness." *State v. Foshay*, 239 Ariz. 271, ¶ 36 (App. 2016) (quoting *State v. Fleming*, 117 Ariz. 122, 125 (1977)). In making this determination, the rules of evidence must not be applied mechanistically to reach an unjust result. *See id.*

**¶17** Parkinson's argument on appeal goes directly to the integrity of the fact-finding process during his trial, including his efforts to diminish the credibility of D.G., the state's primary witness. *See id.* The evidence in question went to the core of Parkinson's defense theory, which was that D.G. had lied about the attack. Similarly, the state's case largely rested on the credibility of D.G.'s account of the incident.

## A. Clear and Convincing Standard for Other Acts by Non-Defendants

**¶18** As an initial matter, the trial court incorrectly concluded that Parkinson needed to prove by clear and convincing evidence that D.G. had committed the specific prior acts in question. Our rules of evidence preclude "evidence of other crimes, wrongs, or acts" offered "to prove the character of a person in order to show action in conformity therewith." Ariz. R. Evid. 404(b)(1). But such evidence may be admissible to show, as relevant here, "proof of motive, opportunity, intent, preparation, [or] plan." Ariz. R. Evid. 404(b)(2). When seeking to introduce evidence of a *defendant*'s prior acts under Rule 404(b), the state must show by clear and convincing evidence that the defendant committed those acts. Our jurisprudence sets forth this elevated standard because the "central purpose" of that rule is to "protect criminal defendants from unfair use of propensity evidence." *State v. Machado*, 226 Ariz. 281, ¶¶ 1, 7-9, 14-16 (2011) (considering other acts by a third party to support third-party culpability defense). This conforms with one of the core purposes of Rule 404(b), which is to "prevent the defendant from being convicted simply because the jury might conclude from the other act that" the defendant was a bad person. *Machado*, 226 Ariz. 281, ¶ 14. But, as our supreme court has reasoned, those due process concerns implicated by introducing a defendant's prior bad acts "do not militate for a higher burden of proof when other-acts evidence is offered to exonerate a defendant." *Id.* ¶ 15.[3] In conformity with this approach, our

---

[3]In this respect, our state standards depart from their federal counterpart. *Compare State v. Terrazas*, 189 Ariz. 580, 582-84 (1997) (departing from federal standard, reasoning that clear and convincing standard protects *defendant* from "high probability of prejudice") *with*

supreme court's 2020 amendment of Rule 404(b) imposed additional notice requirements on the state—not on defendants—for the presentation of such evidence at trial. *See* Ariz. Sup. Ct. Order R-20-0011 (Aug. 27, 2020).

**¶19**        Here, however, the trial court relied on *State v. Fish*, 222 Ariz. 109 (App. 2009), in applying a clear and convincing standard as a precondition to the admission of a non-defendant's relevant prior acts. *See* 222 Ariz. 109, ¶¶ 41, 43 (App. 2009) (self-defense context). But *Fish* has been overtaken by *Machado*. *See* 226 Ariz. 281, ¶ 15. The parties have not cited, and we are not aware of, any post-*Machado* opinion reviving the *Fish* approach in this context. The court's reasoning in *Machado* applies here, where Parkinson's proposed evidence was indispensable to supporting his central defense theory: that D.G. had fabricated this attack as part of a pattern and plan of similar fabrications to have him arrested on domestic assault charges. *See, e.g., id.* ¶¶ 6, 15; *Dunlap*, 187 Ariz. at 456.

**¶20**        We therefore hold that *Machado* controls when a defendant seeks to introduce other acts committed by a non-defendant. Under that authority, trial courts need only find such acts were committed by a preponderance of the evidence, rather than by clear and convincing evidence. *See State v. Terrazas*, 189 Ariz. 580, 584 (1997) (adopting clear and convincing standard for admission of evidence of *defendant*'s prior bad acts, based in part on reasoning that "[s]uch evidence is quite capable of having an impact beyond its relevance to the crime charged and may influence the jury's decision," resulting in "high probability of prejudice"). If Parkinson seeks to introduce this other-act evidence upon retrial, the trial court should determine whether the acts were proven by a preponderance of the evidence.

## B.  Admissibility under Rule 404(b)

**¶21**        Parkinson contends that the precluded evidence should have been admitted under Rule 404(b) to prove D.G.'s "motive and bias to lie" and that it therefore "was not subject to the restrictions of Rule 608." The state primarily responds that the trial court properly precluded the evidence under Rule 608 and that, in any event, its preclusion under Rule 403 is dispositive to our analysis.

---

*Huddleston v. United States*, 485 U.S. 681, 688-89 (1988) (allowing defendant's acts to be admitted under lesser showing).

¶22　　　　As a threshold matter, we cannot agree that the evidence was properly precluded under Rule 608. That rule precludes the presentation of most extrinsic evidence to support or attack a witness's character for truthfulness. *See* Ariz. R. Evid. 608(b). We have previously held that "an effort to impeach on a collateral matter differs significantly from an effort to affirmatively prove motive or bias. Rule 608(b) restricts the former; the [S]ixth [A]mendment protects the latter." *State v. Gertz*, 186 Ariz. 38, 42 (App. 1995). At the time of the incident in question, D.G. faced criminal charges for an assault and disorderly conduct she had allegedly committed against Parkinson and M.B. in February 2021. As Parkinson argued in his motion for new trial, those pending charges provided a powerful potential motive for D.G. to lie to police a month later.[4] They also incentivized D.G. to characterize Parkinson as the aggressor in the relationship, and to secure sympathy from prosecutors and law enforcement. Parkinson was entitled to confront D.G. with facts demonstrating that she had strong potential motivations to make a false report to police in the instant case and that she had done so previously during a comparable and recent series of events. *See Davis*, 415 U.S. at 316-17.

¶23　　　　For similar reasons, we also agree with Parkinson that the evidence fell within Rule 404(b)'s criteria for admissibility. Under that rule, "evidence of other crimes, wrongs, or acts" may be admitted for non-propensity purposes, including "proof of motive, opportunity, intent, preparation, [or] plan." *See also Machado*, 226 Ariz. 281, ¶ 14 (despite apparent universal applicability of Rule 404(b)'s language, its "central purpose is to protect criminal defendants"). As Parkinson repeatedly argued to the trial court, the evidence of D.G.'s prior alleged fabrications, if credited by the jury, could have established her possible motive, plan, and intent to fabricate the underlying assault. *See State v. Gulbrandson*, 184 Ariz. 46, 61 (1995) (evidence of defendant's previous assault on victim "less than one month" before her murder relevant to show defendant's motive and intent).

¶24　　　　Furthermore, several details about the alleged February 2021 incident enhanced the probative value of such evidence in supporting Parkinson's defense theory that D.G. had previously made less-than-credible assertions to police. According to the police report, her

---

[4]Although the charges against D.G. had been dismissed by the time of trial in this matter, they were still pending when D.G. called 9-1-1 and accused Parkinson of the offenses here.

initial account of her injuries was inconsistent with the officers' assessment of her shoulder. That report also records that she offered to "snitch" on Parkinson and M.B. after her resulting arrest. Thus, the officers' account of that incident called into question both the reliability of D.G.'s statements implicating Parkinson and her motivations in uttering them.

¶25        In light of this history, Parkinson was entitled to present his theory that D.G.'s previous conduct—in particular, calling the police to report an allegedly fabricated attack against her and accusing Parkinson of unrelated criminal activity—"shows motive and intent." *Gulbrandson*, 184 Ariz. at 61; *see also State v. Zaid*, 249 Ariz. 154, ¶ 13 (App. 2020) (in context of self-defense claim, victim's prior violent act may be admissible to corroborate defendant's version of events, rather than to prove character of victim). Such evidence was relevant to Parkinson's version of the March 2021 events and went to the heart of D.G.'s credibility, which was the lynchpin of the state's case against Parkinson. *See Dunlap*, 187 Ariz. at 456; *Davis*, 415 U.S. at 317-18 (where "accuracy and truthfulness of [the witness]'s testimony were key elements in the State's case against" defendant, witness's probation status admissible to support "inference of undue pressure" to lie to avoid possible probation revocation and becoming suspect in investigation). Preventing Parkinson from presenting this evidence significantly diminished his rights to present a complete defense, including to meaningfully confront and cross-examine the primary witness against him. *See Chambers*, 410 U.S. at 295.

¶26        We cannot speculate as to whether the jury would have accepted Parkinson's invitation to discount D.G.'s testimony based on his presentation of the precluded evidence. *See Davis*, 415 U.S. at 317; *see also State v. Anthony*, 218 Ariz. 439, ¶ 33 (2008) ("jury must ultimately determine whether the other act is proved"). But, in the absence of such evidence, the jury simply lacked the complete information necessary to assess whether D.G.'s claims of Parkinson's guilt could be believed beyond a reasonable doubt. *See Davis*, 415 U.S. at 317 (jurors entitled to have benefit of defense theory before them to make "informed judgment as to the weight to place" on witness's testimony). Therefore, the trial court erred in preventing Parkinson from eliciting testimony and offering corroborating documentary evidence regarding D.G.'s prior, unsubstantiated accusations against him. *See Delaware v. Van Arsdall*, 475 U.S. 673, 680 (1986) (defendant demonstrates Confrontation Clause violation "by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness," such as when reasonable jury might have received significantly different

impression of particular witness's credibility had defendant's counsel been permitted to pursue proposed line of cross-examination).

## C. Rule 403 Balancing Test

**¶27**     The trial court also found the evidence was inadmissible under Rule 403 due to the likelihood it would cause "unfair prejudice and confusion of the issues and having mini trials." That rule provides that a court may preclude otherwise relevant evidence if "its probative value is substantially outweighed" by the danger of, *inter alia*, "unfair prejudice," jury confusion, or "wasting time." Ariz. R. Evid. 403.

**¶28**     As a general matter, we defer to a trial court's balancing determination under Rule 403, *State v. Gomez*, 250 Ariz. 518, ¶ 15 (2021), and we review such decisions for abuse of discretion, *State v. Thompson*, 252 Ariz. 279, ¶ 41 (2022); *see also State v. Williams*, 133 Ariz. 220, 230 (1982) ("weighing and balancing under Rule 403 is within the discretion of the trial court"). But our deference does not require this court to affirm what the record does not support. *See, e.g.*, *State v. Grannis*, 183 Ariz. 52, 56-57 (Ariz. 1995) (trial court abused discretion in failing to preclude pornographic homosexual photographs pursuant to Rule 403 calculus).

**¶29**     Further, a trial court may abuse its discretion "if it commits an error of law reaching a discretionary conclusion." *Sandretto v. Payson Healthcare Mgmt., Inc.*, 234 Ariz. 351, ¶ 8 (App. 2014); *see also State v. Nevarez*, 235 Ariz. 129, ¶¶ 6, 13, 19 (App. 2014) (appellate courts review legal questions de novo). And, in assessing a trial court's Rule 403 determination, we "look at the evidence in a light most favorable to its *proponent*, maximizing its probative value and minimizing its prejudicial effect." *State v. Castro*, 163 Ariz. 465, 473 (App. 1989) (quoting *United States v. Jamil*, 707 F.2d 638, 642 (2d Cir. 1983)).

**¶30**     Here, as our prior analysis has concluded, the trial court erred as a matter of law in both: (1) treating the excluded evidence as though it related to a collateral matter under Rule 608; and (2) applying an erroneously elevated threshold for assessing its reliability. Given its erroneous conclusion that the evidence was collateral and insufficiently reliable in the first instance, the court necessarily placed too little weight on the probative value of the evidence when conducting its Rule 403 balancing. As our dissenting colleague correctly observes, the trial court specifically stated that it would come to the same conclusion pursuant to Rule 403 even if it had found the precluded evidence to be clear and convincing. But, wholly apart from any assessment of the reliability of proffered evidence, a

trial court cannot properly assess that evidence's probative value without accurately assessing how squarely it relates to the central issues in the case. Here, the court implicitly and incorrectly found the evidence—even if clear and convincing—to be collateral.[5]

¶31 As discussed above, and considering the evidence in the light most favorable to Parkinson, *Castro*, 163 Ariz. at 473, we conclude that the precluded evidence was highly probative of the defense theory that D.G. was biased or motivated to fabricate the March 2021 attack, *see, e.g.*, *Fish*, 222 Ariz. 109, ¶¶ 50-54 (finding trial court erred in Rule 403 balancing because specific acts went to "key issue of self-defense"). For this reason, any risk of unfair prejudice or juror confusion caused by the presentation of that evidence would have to be extraordinary to "substantially outweigh" its probative value.

¶32 Under Rule 403, evidence may be considered unfairly prejudicial if it has "an undue tendency to suggest decision on an improper basis . . . such as emotion, sympathy or horror." *State v. Riley*, 248 Ariz. 154, ¶ 71 (2020) (alteration in *Riley*) (quoting *State v. Schurz*, 176 Ariz. 46, 52 (1993)). However, as our supreme court has observed: "[N]ot all harmful evidence is unfairly prejudicial. After all, evidence which is relevant and material will generally be adverse to the opponent." *Schurz*, 176 Ariz. at 52. Under this reasoning, we have allowed specific acts of violence by a victim to be admitted if offered "to prove whether the defendant had a reasonable belief that he was in danger" in support of a self-defense justification. *Fish*, 222 Ariz. 109, ¶ 18 (collecting cases). And we have allowed evidence of a witness's prior act when used to show the witness was willing to act for the benefit of her defendant spouse. *State v. Uriarte*, 194 Ariz. 275, ¶¶ 20-22

---

[5]In precluding the evidence, the trial court expressed frustration that no party had raised the question of its admissibility until the day before trial. And, it suggested that it may have come to a different conclusion had it been provided an opportunity to more thoroughly consider that question. But the court overlooked that, under the circumstances here, it ruled in favor of the party responsible for failing to challenge admissibility in a timely fashion. The record demonstrates that Parkinson had provided notice of his intent to call a witness to lay foundation for that evidence long before trial—and that the state had nonetheless waited until the day before trial to challenge its admissibility. *See* Ariz. R. Evid. 404(b)(3)(A) (requiring state, but not defendant, to provide formal notice of intent to present evidence of other acts).

(App. 1998) (finding probative value of witness's prior act—threatening to kill victim if defendant was incarcerated—outweighed any prejudice).

¶33            Here, we are at a loss to identify any unfair prejudice to the parties created by the excluded evidence.  Certainly, the evidence presented no danger of prejudicing Parkinson, who had himself offered it.  And the evidence may have eroded D.G.'s credibility, thereby harming the state's case.  But evidence does not become unfairly prejudicial merely because it adversely influences a party's case.  *See Schurz*, 176 Ariz. at 52.  Nor do we consider any prejudice to a witness in our calculations:  Rule 403 was not established to protect the sensibilities or reputation of witnesses.  *See, e.g.*, *Thompson*, 252 Ariz. 279, ¶ 44 (evidence that victim had previously committed irrelevant criminal acts properly precluded because it "could have certainly inflamed the jury's passions, resulting in unfair prejudice" to state's case, not to victim); *Riley*, 248 Ariz. 154, ¶¶ 70-71 (prejudice refers to undue tendency to suggest decision on improper basis, such as emotion, sympathy, or horror).  Thus, the trial court also erred when it included "unfair prejudice" as a factor outweighing the probative value of the evidence.

¶34            Evidence may indeed be omitted under Rule 403 if it would unduly confuse jurors.  *See, e.g.*, *Cruz v. Blair*, 255 Ariz. 335, ¶¶ 24-25 (2023) (evidence of intellectual disability might improperly lead jurors to consider defendant's mental state, when mental state not at issue).  This may occur if, for example, "in attempting to dispute or explain away the evidence thus offered, new issues will arise" requiring new witnesses "whose cross-examination and impeachment may lead to further issues; and that thus the trial will be unduly prolonged," such that the "multiplicity of minor issues" will cause a jury to "lose sight of the main issue."  *State v. Gibson*, 202 Ariz. 321, ¶ 17 (2002) (quoting 1 Joseph M. Livermore et al., Arizona Practice:  Law of Evidence § 403, at 82-86 (4th ed. 2000)).  The trial court did not err in weighing this as a factor.

¶35            However, given the centrality of the excluded evidence to the defense case and the lack of any coherent theory of prejudice to either of the parties, we conclude that any risk of juror confusion would not alone substantially outweigh its probative value.  *See Foshay*, 239 Ariz. 271, ¶ 36 (rules of evidence must not be applied mechanistically to reach an unjust result). We draw this conclusion mindful that the trial court possessed tools to substantially mitigate any juror confusion or delay.  Our trial courts may place reasonable limitations on the amount and specificity of the testimony admitted surrounding the relevant prior acts.  They may also provide

limiting instructions to direct the jury to the relevant uses of that evidence. *See Fish*, 222 Ariz. 109, ¶ 52.

**¶36** Finally, we cannot agree that the erroneous preclusion of the evidence was harmless. The state carries the burden of demonstrating beyond a reasonable doubt that the error did not contribute to or affect the verdict. *See State v. Henderson*, 210 Ariz. 561, ¶ 18 (2005) (preserved error reviewed for harmlessness); *State v. Bible*, 175 Ariz. 549, 588 (1993). The state argues any error was harmless because the precluded evidence might have merely reflected on both Parkinson and D.G. negatively. It further contends that introducing the excluded evidence would have opened the door for the state to introduce other acts committed by Parkinson against D.G. And, it maintains that the admitted evidence was "compelling" that Parkinson was guilty. It speculates that a jury was "just as likely" to find from the excluded evidence that D.G. and Parkinson merely had a dysfunctional relationship. But that falls far short of a showing beyond a reasonable doubt that the preclusion did not affect the jury's assessment of D.G.'s credibility and, as a result, its verdict. *See Bible*, 175 Ariz. at 588. By the state's own summation, D.G.'s credibility was the lynchpin of the state's case. If the jury could not credit that testimony beyond a reasonable doubt, Parkinson was entitled to an acquittal.

**¶37** Nor can we agree that the remaining evidence of guilt was overwhelming. *See, e.g., State v. Leteve*, 237 Ariz. 516, ¶ 25 (2015) (in deciding harmlessness, question is whether guilty verdict actually rendered was surely unattributable to identified trial error). Notably, the state's strongest evidence surrounded D.G.'s visible injuries to the extent examined by the police on the day of the incident. But the trial court struck testimony from Parkinson that D.G. had a history of self-harm. Further, D.G. had declined proper medical and forensic evaluations after the incident here. For all of these reasons, we cannot find the error harmless in this case. Parkinson is therefore entitled to a new trial.

## II. Officer Testimony

**¶38** Parkinson argues the trial court erred by allowing Officer Summers to testify "that a red dot in D.G.'s eye and a mark on her ear were petechiae" because Summers "was admittedly unqualified to render expert testimony regarding strangulation." As with other evidentiary determinations, we review the court's decision whether to admit expert

testimony for abuse of discretion.[6]  *See State v. Delgado*, 232 Ariz. 182, ¶ 9 (App. 2013).

**¶39**        Before trial, Parkinson filed a motion *in limine* arguing Summers was not qualified as any type of expert, such that any statement that he had observed petechiae on D.G. should be precluded as inadmissible opinion testimony under Rule 701, Ariz. R. Evid.  During argument on the motion, the parties discussed Summers's qualification to testify as an expert, based on his "training and experience" as an officer. The trial court denied Parkinson's motion to preclude the testimony, provided the state could "provide foundation, that is that his background and experience demonstrates he has specialized training or experience in the symptoms of strangulation which would include petechiae."

**¶40**        During trial, Summers testified that he had undergone seventeen weeks of basic training, seven weeks of post-basic training, and five or six months of field training.  He further stated that some of his training had "touch[ed] on strangulation."  Later, Summers testified that he had spoken with D.G. on the day of the incident and had taken photographs of her injuries.  Summers testified that one of these photographs showed "what we call petechiae, which is blood vessels that have burst in the ear." He stated he had learned about petechiae "from [his] strangulation training" during basic training.  He later testified that a different photograph showed petechiae in D.G.'s right eye.  Summers then agreed that D.G.'s injuries were consistent with signs of strangulation, "based on [his] training and experience."  Parkinson did not object to this testimony or to its foundation.  However, Parkinson did object on redirect examination when the state asked Summers whether, based on his training and experience, "that appear[ed] to be petechiae to you," and the officer answered, "To me it did."  The trial court overruled the objection.

**¶41**        The parties disagree about whether this alleged error was preserved for our review under a harmlessness standard, or whether a fundamental error standard instead applies.  Because our finding of error as to the Rule 404(b) issue compels a remand for a new trial, we need not decide whether the issue was properly preserved, and we address only the issue that might recur on retrial:  whether the denial of Parkinson's motion to preclude was error.

---

[6]We address this issue because it may recur on retrial.

¶42 Rule 701(c) provides that testimony is that of a lay witness, or a non-expert, if it is "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702," Ariz. R. Evid. And under Rule 702, "[a]n expert witness is someone qualified 'by knowledge, skill, experience, training, or education,' whose knowledge assists the jury in understanding the evidence, who testifies based on sufficient facts and applies reliable 'principles and methods to the facts of the case.'" *Thompson*, 252 Ariz. 279, ¶ 63 (quoting Ariz. R. Evid. 702).[7] To qualify as an expert, "he or she need only possess 'skill and knowledge superior to that of [people] in general.'" *State v. Romero*, 239 Ariz. 6, ¶ 17 (2016) (alteration in *Romero*) (quoting *State v. Girdler*, 138 Ariz. 482, 490 (1983)). The state laid sufficient foundation to show Summers met this standard. It identified the ways in which his training in symptoms of strangulation is superior to that of the general public. *See id.* ¶¶ 17-18; *see also Thompson*, 252 Ariz. 279, ¶ 63 (extensive training "not required," "only a degree of expertise in the subject" sufficient to assist jury). Although Summers agreed on cross-examination that he was "not qualified as a strangulation expert in any way," that agreement did not render him incapable of identifying symptoms that were consistent with petechiae, based on his training and experience in responding to domestic violence incidents. *See Thompson*, 252 Ariz. 279, ¶¶ 60, 64 (extensive law enforcement experience rendered retired officer competent to identify defensive wounds on victim's body). And to the extent Summers was not the most qualified expert to opine as to the likelihood that the marks he observed on D.G. were actually petechiae, this "went to the weight of his testimony, not its admissibility." *Id.* ¶ 64; *see also State v. Davolt*, 207 Ariz. 191, ¶¶ 70, 75 (2004) (detective properly testified as expert where training consisted of classes and watching two training videos because, although "this training is not extensive, it is significantly more extensive than the average person has received"). Therefore, we reject this claim.

---

[7]Effective January 1, 2024, Rule 702 was amended to "conform to the changes made to Federal Rule of Evidence 702" in order "to clarify the standard of proof that the proponent of expert testimony must satisfy as well as to address the issue of expert overstatement." Ariz. Sup. Ct. Order R-23-0004 (Aug. 24, 2023); Ariz. R. Evid. 702 cmt. to 2024 amend. These changes are not relevant to our reasoning in this case.

**Disposition**

¶43          For the foregoing reasons, we vacate Parkinson's convictions and terms of probation and remand for a new trial.

B R E A R C L I F F E, Presiding Judge, dissenting:

¶44          I agree with the majority decision in full except for its failure to defer, and reasons for failing to defer, to the trial court's exclusion of evidence under Rule 403, and consequently in the result.  The majority correctly notes that the court found the subject evidence inadmissible under Rule 403 on the grounds of "unfair prejudice and confusion of the issues and having mini trials" (that is, risking a waste of time).  But then, after also correctly recognizing that we must defer to a trial court's balancing determination under Rule 403, as instructed by *Gomez*, 250 Ariz. 518, ¶ 15, it fails to do so.

¶45          The majority concludes that because the trial court erroneously determined "that the evidence was unreliable in the first instance, the court improperly placed too little weight on the probative value of the evidence when conducting its Rule 403 balancing."  But that conclusion presupposes that the court found the evidence barred by Rule 403 *because* it found it irrelevant or gave it little weight.  That is not so.  In its order reaching the Rule 403 determination, the court stated that

> The Court affirms its ruling that it's not relevant and any of these prior acts, et cetera, *even if they were relevant*, the Court finds that there's a danger of unfair prejudice, confusing the issues. Let's keep the case to what happened in this case and not other acts.

(Emphasis added.)  And then, later in the day, after Parkinson made an offer of proof, and in relation to its determination that the evidence did not meet the clear and convincing standard, the court stated

> I think clear and convincing evidence is the standard and I don't find that a defendant just testifying, without police reports, without anything that this happened, that that meets the clear and convincing standard.

> ***And even if it did***, as I stated in the morning, the probative value of that is substantially outweighed by the dangers of unfair prejudice and confusion of the issues and having mini trials.

(Emphasis added.) These statements by the court clearly show that, rather than building on its earlier conclusion of irrelevance, or even its (erroneous) application of the clear-and-convincing standard, the court set those determinations aside, and reached its conclusion on Rule 403 independently.

**¶46** Rule 403 states: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, [or] misleading the jury." Our supreme court, in *Gomez*, explained "if the [Rule 403] standard is met, the court 'may' exclude relevant evidence. The term 'may' indicates discretion." 250 Ariz. 518, ¶ 14 (alteration added). In such fact-specific inquiries, as was present in *Gomez*, as to the prejudice analysis, and, in my view, is also present here as to the risk of confusion, waste of time and mini-trials, we must rely "heavily on and defer . . . extensively to, the discretion of the trial court, which is in a far better position than an appellate court to weigh potential prejudice in the overall context of the case." *Id.* ¶ 15. The trial court is in much better position than we are to determine whether, in light of the entire case, the evidence needed for Parkinson to further his theory of the case would have resulted in confusion of the jury or mini-trials and a waste of time.

**¶47** Despite my agreement with the balance of the Opinion, because the majority has not given the trial court's determination under Rule 403 sufficient deference, I respectfully dissent. And because the court's determination under Rule 403 is dispositive, I would affirm.